LENNARD D. GREENBAUM and MARGERY E. GREENBAUM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greenbaum v. Commissioner
Docket No. 7898-84.
United States Tax Court
T.C. Memo 1987-222; 1987 Tax Ct. Memo LEXIS 216; 53 T.C.M. (CCH) 708; T.C.M. (RIA) 87222; April 29, 1987. Edward I. Sussman, for the petitioners. Brian Masumoto, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioners' 1978 and 1979 Federal income tax of $26,992.15 and $185.00, respectively. By amendment to answer, respondent also seeks increased interest pursuant to section 6621(c). [1] After concessions, [2] the issues for decision are: (1) whether the purchase and subsequent leasing of certain computer equipment by the Threeby Associates general partnership ("3B") should be respected for Federal tax purposes; if so, (2) whether 3B claimed the proper amount of depreciation in its first taxable year; (3) whether 3B qualified as a "noncorporate lessor" eligible to claim the investment tax credit ("ITC") under section 46(e)(3); and, (4) whether petitioners' investment with 3B generated a substantial underpayment of tax attributable to a tax-motivated transaction within *219 the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and the stipulation and attached exhibits are incorporated herein by this reference. Petitioners resided in Altamonte Springs, Fla., when they filed their petition. The Transaction
In 1976, Tom Martin and Paul Raynault formed Computer Financial Company, Inc. ("CFI") to own and lease computer equipment. *220 CFI also projected residual values of large computers and advised computer owners, lessors and lessees with respect thereto. On May 24, 1978, CFI purchased from International Business Machines Corp. ("IBM") the following computer equipment (sometimes referred to as the "equipment" or the "3148") at the prices set forth below: 1 Model 3148-K Central Processor
$658,450.00
1 Model 2150 Control Store Extension
13,950.00
1 Model 4660 Integrated Storage Control
63,220.00
1 Model 3047-1 Power Unit
14,440.00
$749,160.00
The Agreement for Purchase of IBM Machines provides: The Customer agrees to purchase and International Business Machines Corporation (IBM) by its acceptance of this Agreement agrees to sell, in accordance with the following terms and conditions, the machines and features listed below and more fully described in the attached Specification Sheets. Under such terms and conditions, IBM will 1) sell machines to the Customer, 2) provide warranty service for machines and 3) as available, furnish programming and programming services, all as described herein. The Customer agrees to accept the machines, warranty service, programming and programming services *221 under the terms and conditions of this Agreement. The Customer further agrees with respect to the machines and programming to accept the responsibility for 1) their selection to achieve the Customer's intended results, 2) their use and 3) the results obtained therefrom. The Customer also has the responsibility for the selection and use of, and results obtained from, any other equipment, programs or services used with the machines and programming. It further provides: Commencing on the Date of Installation of each machine and continuing for the duration of the warranty period, IBM agrees to provide, at no additional charge to the Customer, except as set forth in the Section entitled "Exclusions," warranty service to keep the machines in, or restore the machines to, good working order. Also on May 24, 1978, CFI executed a lease agreement with Meijer, Inc., ("Meijer") a Michigan corporation, providing for the rental of all the equipment to Meijer for an initial term of 18 months commencing on June 1, 1978. After the initial term, the lease was terminable by either party. The rent payments under the lease were to be made according to the following schedule: [3]
Months 1 through 12
$23,501 per month
Months 13 through 18
$20,288 per month
*222 The monthly rent decreased by $3,213 after the twelfth month, when IBM's free maintenance policy terminated. [4]
The Meijer lease was a net lease the benefits of which were assignable by the lessor. Upon its termination the equipment was to be returned to the lessor or the lessor's designee. On June 1, 1978, petitioner [5] entered into an agreement for the formation of 3B, a New York general partnership. Also signing the agreement were Barbara H. Schwartz, Alfred P. Slaner, Raymond Dubrowski and Beatrice Goldschmidt for Golby Company. The partnership *223 filed its income tax returns for the calendar years in issue using the accrual method of accounting. On June 22, 1978, a Business Certificate for the partnership was filed with the County Clerk, New York County, New York, signed by the same parties as those signing the partnership agreement, except that Lawrence E. Goldschmidt, not his wife, signed for Golby Company. At all relevant times, Mr. Goldschmidt was a partner of Michael Oshatz in the law firm representing petitioner in this case. As described more fully below, Oshatz promoted the 3B investment to Goldschmidt, who interested other 3B investors. [6]
Petitioner held a 20 percent share in 3B, for which he paid $27,000 by check dated June 21, 1978. By the terms of the partnership agreement, all allocations and distributions were to be pro rata. On June 1, 1978, 3B and CFI entered into a Marketing and *224 Remarketing Agreement. Paragraphs 1-3 of that agreement provide as follows: 1. Marketing Service. CFI had the sole responsibility for locating the Lessee and arranging the Lease. For this marketing effort. [sic] CFI shall receive a monthly fee of 15% of the actual monthly revenue collected from the Lessee during the initial lease term and any subsequent terms with [Meijer]. 2. Remarketing Service. The [3B] Partnership agrees that at the end of the [Meijer] Lease or any subsequent lease with respect to the Equipment, CFI shall have the right to the exclusion of all others [sic] brokers or the Partnership's own efforts to remarket the Equipment at the time it becomes available for remarketing. The Partnership agrees that it shall notify CFI within 5 business days of any notices of information received from the initial Lessee or any subsequent Lessee of the potential availability of the Equipment to be remarketed by CFI and of any other information that bears on the lease or the equipment. CFI shall receive a monthly service fee of 5% of the actual monthly revenue collected from any subsequent lessees. At any period after the Equipment has been owned for 7 years, *225 CFI can, at its sole discretion, arrange for the sale or the lease of the Equipment. The fee for a sale shall be 5% of the net sale proceeds. 3. Structure and Debt Placement Service. CFI had the sole responsibility for arranging the debt ("Debt") used to partially finance the purchase of the Equipment and setting up the financial structure of the transaction. For this service, CFI will be paid a fee equal to 15% of the cost of the Equipment. This fee will be paid out of the first proceeds available from the lease or sale of the Equipment after the Debt has been repaid and the Partnership has recovered its full equity investment. Thus, CFI was entitled to three fees: (1) a marketing fee of 15 percent (or 5 percent, for lessees other than Meijer) of the rental payments; (2) a sale fee of 5 percent of the net sale proceeds; and (3) a financing fee of 15 percent of the cost of the equipment payable out of the first proceeds available after debt retirement and equity recovery. On June 2, 1978, 3B purchased the equipment from CFI for $749,160 cash. [7] The cash was transferred to CFI on June 27, 1978, $127,357 from partnership capital, and the balance through a loan from Term *226 Industries ("Term"), a New York corporation. CFI assigned its interest in the Meijer lease to 3B. 3B granted Term a security interest in both the equipment and the lease. The Bill of Sale between CFI and 3B provided as follows: KNOW ALL MEN BY THESE PRESENTS, that COMPUTER FINANCIAL INC., a New Jersey corporation having its principal place of business at One University Plaza, Hackensack, New Jersey (the "Seller") for and in consideration of the sum of SEVEN HUNDRED FORTY NINE THOUSAND, ONE HUNDRED SIXTY ($749,160.00) DOLLARS, lawful money of the United States paid by THREEBY ASSOCIATES (the "Partnership"), a New York general partnership consisting of Barbara H. Swartz, [sic] Alfred P. Slaner, Raymond Dubrowski, Lennard E. Greenbaum [sic] and Goldby Associates [sic] and having its principal place of business at 655 Madison Avenue, New York, New York (the "Buyer") the receipt whereof is hereby acknowledged has bargained and sold, and by *227 these presents does grant and convey unto the Buyer, its heirs, executors, administrators, successors, and assigns the IBM Computer Equipment on Schedule A attached hereto and all rights to service in the IBM Purchase Agreement dated May 24, 1978 with respect to the Equipment. TO HAVE AND TO HOLD the same unto the said Buyer, heirs, executors, administrators, successors and assigns forever. IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sales [sic] as of this 2 day of June, 1978. COMPUTER FINANCIAL INC. By /s/ Tom Martin THREEBY ASSOCIATES By /s/ Lawrence E. Goldschmidt Schedule A listed the equipment at issue here. By letter dated June 5, 1978, CFI notified Meijer that all rental payments for use of the equipment should be forwarded to Bankers Trust Company of New York. No documents are in the record to evidence the transaction by which Bankers Trust obtained the right to receive lease payments. On June 28, 1978, CFI, Martin and Raynault, and Computer Finders, Inc., another Martin/Raynault company, executed a limited guarantee in favor of Term for the principal amount of the loan to 3B plus interest. It is unclear what consideration, if *228 any, flowed to the guarantors for their undertaking. After the Meijer lease terminated, CFI re-leased the equipment [8] (less one megabyte of memory) to the Rouse Company of Columbia, Maryland. [9] This lease was dated November 28, 1979 and commenced upon installation of the equipment on December 10, 1979. Monthly rent was $10,687 and the initial lease term was 20 months. One megabyte of the computer's memory was re-leased to CMI of Troy, Michigan for $1,400 a month, for an initial term of 36 months. [10]
During 1979, CFI incurred $7,718 for additional IBM features for the equipment, to remove some memory from the equipment, and to insure expeditious delivery of the equipment (presumably to Rouse). Although Raynault knew he had to get Oshatz' consent to purchase the additional features, CFI planned to claim these as 1979 tax deductions, since they were not incurred *229 by 3B. The Rouse Company elected not to renew its lease at the end of the initial lease term. Apparently because CFI would have to pay Term under its guarantee, it leased back the equipment on August 1, 1981 after the Rouse lease ended. CFI then paid 3B rent in an amount equal to its guarantee payments to Term. [11]
The Transaction Participants
When Raynault met Oshatz in 1971, he was impressed with Oshatz' ability to understand his business, and sought Oshatz' legal services. Although the first computer leasing venture in which Oshatz represented Raynault was unprofitable, Raynault's subsequent activities were very profitable for both him and Oshatz. From 1971 to 1978, almost all of Raynault's computer leasing work was done with corporate investors and Oshatz helped negotiate these transactions with firms like General Electric Credit Corporation and Bank of America. CFI did not have the cash to finance its purchases and always had an investor lined up before it purchased a computer. Oshatz was equally impressed with Raynault, whose abilities he thought were of the highest caliber. Oshatz had *230 asked Raynault to keep him in mind if a relatively small transaction arose, because he or some of his associates would be very interested in a leasing shelter that was within their financial means. Therefore, when Raynault called to Oshatz' attention the transaction at issue in this case, Oshatz was interested. Raynault informed Oshatz of the term of the lease, the monthly rental amount, the financial ability of the lessee, and the profit potential involved. Raynault told Oshatz that between $125,000 and $200,000 profit could be expected on a $125,000 investment. At some point after the investment, Raynault provided Oshatz with three schedules disclosing (1) the basic facts of the deal (debt/equity percentages, "implicit maintenance costs," expensed versus capitalized costs, lease rates and term, and loan repayment), (2) "cash flow" from the Meijer lease, and (3) tax benefits. Oshatz did not see these schedules before the 3B investment, but he was shown the figures that appeared on the tax benefits schedule ("Schedule 3"): SCHEDULE 3 - TAX BENEFITS
Year
1978
1979
1980
1981
1
2
3
4
Income:
$157,456.70 * $246,283.20 $161,820 $126,220 Expenses: 15%/5% fee
23,618.51 36,942.50 8,091 6,311 Interest
38,002.81 64,432.14 44,734 31,139 Depreciation
201,198.86 143,713.47 119,761 95,809 Implicit
Maint.
25,104.90 19,859.10 Total
$287,925.08 $264,947.21 $172,586 $133,259 Profit
(Loss)
($130,468.38)
* ($18,663.91)
($10,766)
($ 7,039)
Cash Flow
*231 SCHEDULE 3 - TAX BENEFITS
Year
1982
1983
1984
1985
5
6
7
(sale)
Income:
$98,448
$76,800
$59,904
$131,940
Expenses: 15%/5% fee
4,922
3,840
2,995
6,597
Interest
19,967
10,612
2,669
0
Depreciation
71,857
47,905
23,952
0
Implicit
Maint.
Total
$96,746
$62,357
$29,616
$ 6,597
Profit
(Loss)
$1,702
$14,443
$30,288
$117,838
Cash Flow
$ 9,519
$117,838
Thus, the 1979 loss could be as low as ($7,652). Schedule 3 projected lease income until the time of sale and "residual" value of the equipment at the time of sale. Raynault repeatedly testified that these figures were intended only to satisfy Oshatz' concern over whether or not he could lose money, and presented a "worst case scenario." According to Raynault, Schedule 3 was a worst case scenario because the periodic percentage reductions in both lease income and residual value which were applied in the schedule were projected *232 to begin a year before the reasonable investor in 1978 would have anticipated. [12]
Although Oshatz could not say specifically what expenses would be incurred by CFI, he expected that Raynault would make a reasonable profit through the imposition of fees on the transaction. He understood that investor profit would be made only after the underlying debt was paid off. Although he did not obtain an independent appraisal of the equipment's value, Oshatz trusted Raynault's opinion. Oshatz thought about the deal's risk. He thought that the investors could take a deduction for the component of the equipment's purchase price deemed to be applicable to the maintenance IBM provided for one year, but knew they were without a ruling from respondent so stating. He also thought a large part of the debt would be amortized during the *233 first brief lease term but still wondered about adequate economic return. After Oshatz was contacted by Raynault, he spoke to Lawrence Goldschmidt, his law partner. Goldschmidt and Oshatz had discussed on several occasions the possibility of buying and leasing a computer. In a brief discussion, Oshatz revealed to Goldschmidt what he thought was a good opportunity and asked whether or not Goldschmidt believed he could put the money together. Goldschmidt was in the habit of investing with friends, relatives and office clients. They generally relied on his business judgment in selecting an appropriate investment and entered into the transaction based on his recommendation. Oshatz had told Goldschmidt who the promoters were, that he had represented them for a long time and had the highest regard for them, and that their expertise lay in projecting residual values. This expertise was important here, Oshatz emphasized, because in the leasing business a good part of any profit was in the residual value of the leased equipment. He told Goldschmidt that the debt required might not be repaid until all the rental payments had been made. Oshatz discussed with Goldschmidt the quality *234 of the lessee, as well as the tax benefits. After a few minutes Goldschmidt agreed to the transaction. Either the same day or soon after Raynault called Oshatz, Oshatz told Raynault that he and his investors would take the deal. The documents used in the 3B transaction were drafted under the direction of Oshatz by an associate in his firm. Goldschmidt never read any of the documents involved, except perhaps the partnership agreement, and merely signed them in reliance on Oshatz. Oshatz, however, could not recall whether he reviewed all the documents or to what extent they were generated from prior agreements. Goldschmidt is designated managing partner in the 3B Partnership Agreement, and although he conceived his role as being available for consultation regarding the remarketing of the equipment, he did not materially participate in any of the negotiations with CFI. Further, he had no recollection of the re-leasing. Goldschmidt did not recall discussing fees with anyone. In 1978, Goldschmidt was familiar with the small end of IBM's computer product line through computerization of some of the mortgage investment activities in which he was involved. Also, various people *235 that Goldschmidt knew socially were in the computer leasing field. Prompted by their success, Goldschmidt did some research on buying and leasing computer equipment. Goldschmidt had not invested in any equipment leasing transactions before 1978. However, he did attempt to invest in several leasing transactions involving trucks and an oil rig. As a real estate attorney, Goldschmidt did not do any legal work regarding equipment leasing transactions. Petitioner had invested with Goldschmidt in the past. Regarding the 3B transaction, Goldschmidt told petitioner only that he thought it was an attractive investment, it had a real shot at making some money, and no risk of losing the invested funds. IBM Computers
Because of IBM's maintenance policies and practices, and the lack of moving parts in its computers, physical deterioration plays little or no role in computer obsolescence. IBM's introduction of new technology is the most important factor affecting the value of older computers. As more sophisticated, less expensive equipment appears, it becomes more cost effective to use a newer computer. As of the early 1970's, it was customary for IBM to introduce a new line *236 or generation of computers every four to six years. The IBM System 360 computer line was introduced in 1964. This was replaced in 1970 by the IBM System 370 computer line. The IBM 3148 was introduced in July of 1976. In 1977, IBM announced three models -- the 3031, 3032, and 3033. The 3148 and the 3031, 3032 and 3033 represented substantial advances over prior models, but were not new "generations" because they were compatible with other members of the System 370 generation. Because of their timing and technological advancement, however, and because IBM had represented that its development of new technology would be "evolutionary" and not "revolutionary," many thought these models were the early members of a new generation. In January of 1979 IBM announced the Model 4300 product line. Initial reports indicated this line would offer up to four times the processing capability per dollar of the previously available computers. The 4300 represented the most extensive increase in price/performance capability in the history of IBM. The increase far exceeded what most industry experts were predicting before its release. The 4300 sent the used computer leasing industry into disarray, *237 and values of earlier models dropped more dramatically than expected. On their 1978 Form 1040, petitioners claimed a partnership loss derived from their 3B activities in the amount of $27,624. This included depreciation deductions passed through to them by 3B. 3B claimed 1978 depreciation deductions of $201,199 on a depreciable basis of $704,196, using the class life asset depreciation range (ADR) system and the "modified half year convention." They also claimed an ITC of $14,084 in connection with their 3B investment. On their 1979 Form 1040, petitioners claimed no losses or credits in connection with 3B. Respondent determined deficiencies which were based on disallowance of 1978 and 1979 losses and credits. Petitioner concedes 1978 losses in excess of $27,000 and respondent concedes error regarding disallowance of a 1979 3B loss. See n. 2, supra.
OPINION In this case, respondent argues (1) that the transaction lacked economic substance, (2) that petitioners did not have the benefits nor the burdens of ownership of the equipment, (3) that petitioners entered into the transaction with no valid business purpose other than the receipt of tax benefits, (4) that even if *238 we respect the transaction, petitioners are not eligible to claim the ITC because they failed the so-called 15 percent test under section 46(e)(3)(B), (5) that even if we respect the transaction, the partnership incorrectly reported depreciation deductions for 1978, and (6) that petitioners' resulting substantial underpayment of tax is attributable to a tax motivated transaction. Petitioners argue that the transaction was a bona fide business transaction which should be respected for Federal tax purposes, entered into with a business purpose and which had economic substance. They also counter respondent's investment tax credit, depreciation deduction and section 6621(c) arguments. Economic Substance
Generally, the form of a leasing transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor. Frank Lyon Co. v. United States,435 U.S. 561, 585 (1978); Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). "We cannot ignore the reality that the tax laws affect the shape of nearly every business." Frank Lyon Co. v. United States,supra at 580. Therefore, the *239 existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States,supra at 581; Packard v. Commissioner,85 T.C. 397, 417 (1985); Estate of Thomas v. Commissioner,supra at 432. When, however, a transaction has no economic purpose other than to obtain favorable tax consequences, the form of the transaction will be disregarded by the Court. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 195 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243, 1244 (1981). This Court has recently decided a number of cases involving computer equipment leasing transactions. See Torres v. Commissioner, 88 T.C.     (Mar. 30, 1987); Bussing v. Commissioner, 88 T.C.     (Feb. 23, 1987); Gefen v. Commissioner,87 T.C. 1471 (1986); James v. Commissioner,87 T.C. 905 (1986); Mukerji v. Commissioner,87 T.C. 926 (1986); Coleman v. Commissioner,87 T.C. 178 (1986); *240 Estate of Thomas v. Commissioner,supra; and Rice's Toyota World, Inc. v. Commissioner,supra.[13] We analyze this case under the teachings of those cited above. In Frank Lyon Co. v. Commissioner,supra, the Supreme Court addressed the question of whether a sale and leaseback of an office building should be respected for tax purposes. Finding that sufficient non-tax reasons existed for the transaction, and that the lessor retained sufficient attributes of a traditional lessor, the Court respected the form of the transaction, giving the purchaser-lessor interest, depreciation and other deductions in connection with the arrangement. Our interpretation of Frank Lyon was affirmed on appeal in Rice's Toyota World, Inc. v. Commissioner,supra. There it was held that a sale and leaseback will be respected for Federal tax purposes if we find either (1) the taxpayer had a business purpose for the transaction *241 such as economic profit apart from tax benefits, or (2) there was a realistic objective possibility of economic profit on the part of the investors. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 209; 752 F.2d at 91-92. We found that an economic profit was reasonably likely when the transaction was entered into in Estate of Thomas v. Commissioner,supra. We therefore rejected respondent's reliance on Rice's Toyota World in that case, and concluded the purchaser-lessor was the true owner of the asset involved, and was entitled to claim the tax benefits. 84 T.C. at 434-439. Estate of Thomas involved a set of facts facially similar to those present here. There, brokers located potential computer lessees. The partnership which hired the brokers acquired legal title to the equipment, for which it paid fair market value. The partnership invested somewhat more than 10 percent of the systems' cost in cash and financed the balance with nonrecourse debt from third-party lenders. Our opinion in Coleman v. Commissioner,supra, turned on the burden of proof regarding ownership. We found that title to *242 the equipment had already been transferred by the party from whom the taxpayer sought to derive his equity interest. We therefore concluded the taxpayer had not shown he had a depreciable interest in the equipment. In Coleman we also examined the equipment's fair market value to determine whether the taxpayer had "genuine indebtedness." We did not, however, engage in the Rice's Toyota analysis of profit potential or business motivation. In Mukerji v. Commissioner,supra, we found for the taxpayers on the strength of their objective potential profit showing. Because the Rice's Toyota tests are disjunctive, we simply commented in a footnote that the taxpayers also had a profit motive. See Mukerji v. Commissioner,supra,87 T.C. at 928 n. 34. In James v. Commissioner,supra, we found for respondent because the taxpayer had failed to show any realistic potential for profit. We also stated there that as sophisticated investors, the taxpayers should have known that the transactions at issue could not achieve non-tax profit. The subjective Rice's Toyota test, therefore, could not be relied on by them. *243 James v. Commissioner,87 T.C. at 924 n. 5. Gefen v. Commissioner,supra, also involved IBM computer equipment similar to that involved here. There, we approved the transaction as having economic substance. We found that a reasonable investor could have expected an economic profit and held that 1984 residual value projections of 20 percent as of 1977 were reasonable. In Bussing v. Commissioner,supra, we disregarded elements of the transaction which were mere window dressing, but allowed the taxpayers to claim distributive losses with respect to the balance of the transaction, up to their amounts at risk. In Torres v. Commissioner,supra, we held that the transaction virtually assured the taxpayers an economic profit, that their partnership had the benefits and burdens of ownership of the computer equipment and that they engaged in their computer leasing activities for profit. In analyzing the transaction here for objective profit potential, we must determine what the 1978 investor should have expected regarding the computer's residual value. We now therefore review and evaluate the expert testimony. Paul Raynault[14] *244 was stipulated to be an expert, qualfied to testify on computer value. His report was based on his "learning curve" forecast methodology. This assumes that both lease income and residual sale value decrease at an average rate of 22 percent a year. Because technology was assumed to advance at a rate of between 20 and 25 percent annually, Raynault inferred that older computers would have to drop in price at that rate if they were to stay competitive. Thus, Raynault concluded that old computers should drop to 78 percent of their previous value each year. When the 22 percent decrements would begin under Raynault's theory is somewhat ambiguous. Apparently, they begin only when a new generation of computers is introduced, although some decrement in value smaller than 22 percent occurs soon after sale by IBM. This initial drop is attributable to restriction of the availability of the ITC to the purchaser of used equipment. Also, the cost of maintenance must usually be deducted from the price of used equipment for it to be competitive with new equipment, giving *245 rise to an additional value decrement. Schedule 3, which was included in Raynault's report, projected a residual sale value for 1985 and lease income values for prior years. The income and sale value projections were apparently based on the following methodology. The 1978 and 1979 income value figures represented the actual gross receipts to be expected from the Meijer lease. For 1980, an income value was determined by discounting the 1979 figure first 16 percent (10 percent for ITC unavailability and 6 percent for free maintenance unavailability) and then 22 percent (the first of the annual decrements, beginning the year in which a new line of computers will likely be announced). The 1981-1984 income values were arrived at by discounting the prior year's value 22 percent. The 1985 residual sale value was derived by discounting the original cost of $749,160 16 percent after the first year of ownership and 22 percent each succeeding year, as illustrated by the following chart: Date
Residual Value
% Decrease
June, 1978
$749,160.00
June, 1979
629,294.40
16%
June, 1980
490,849.63
22%
June, 1981
382,862.71
22%
June, 1982
298,632.91
22%
June, 1983
232,933.67
22%
June, 1984
181,688.26
22%
June, 1985
141,716.84
22%
October, 1985
[15] 131,329.00
[16] 7.33%  *246 Raynault assumed in Schedule 3 that annual rent decrements would begin at the end of the Meijer lease, in December of 1979. He assumed that a new line of computers would be introduced by then. Raynault also included in his trial report a "more likely scenario." Raynault had not provided this schedule to the 3B partners or Oshatz at the time of their investment. There, he assumed that a new computer line would be released a year after the end of the Meijer lease and that 22 percent annual decrements would not begin until that time, i.e., the end of 1980. Under the "more likely scenario," then, the 1985 sale price would be derived by ascribing each value in the above chart (except the first two) to the following year. The first two values would remain with their respective years, and the 1979 value would remain constant for 1980. The October 1985 value is derived by discounting $181,688.26 (the June 1985 value) by 7.33 percent for a final residual value *247 of $168,370.51. [17]
Raynault analyzed the fees charged by CFI for marketing and re-marketing by looking to those customarily charged in the industry. He stated that they are generally tied to the work performed, and that CFI's marketing fees were reasonable by that standard. He did not comment on CFI's work relating to its debt placement fee. Raynault testified that a tax deduction for IBM's free maintenance could be justified on four grounds. First, the cost of providing free maintenance is probably reflected in the purchase price IBM charges because it does not provide free maintenance to rental customers. Second, the used market discounts a machine that no longer qualifies for free maintenance. Third, the IRS has ruled, in a private letter ruling with respect to other investors in a similar arrangement, that the maintenance component of the purchase price of IBM equipment is a deductible expense. Fourth, Meijer agreed to pay a higher rent during the initial 12 months of the lease, acknowledging inclusion *248 of the maintenance fee for those months. Petitioner's second expert, Esmond C. Lyons, Jr., was also stipulated to be qualified. Lyons was not involved with IBM computers in June of 1978, but with sales and marketing of high performance image processing equipment. The report he prepared around the time of trial was based, however, on information in his company's comprehensive data base that would have been available in June of 1978. Lyons believed it was predictable that as of June 1978 the residual value of the 3148 could be expected to fall somewhere between two extremes. If competitive pressures became much stronger than expected, IBM might reduce list prices by an additional 15 to 20 percent over their expected market decline in value. With such market decline to December 1979 of 15-20 percent, [18] 3148 prices would be about 60-65 percent of the original IBM list price. [19]
Conversely, if the 3148's continued to sell well, used *249 prices after 18 months would be about 80-85 percent of the IBM list price. [20] This was typical of most predecessor products in the first few years after initial introduction. Lyons concluded, then, that as of June 1978, a used IBM 3148 could be expected to be selling 18 months later for between 60 percent and 85 percent of list price. Under the most probable conditions, the equipment would be selling for between 70-75 percent of the IBM list price. [21] The list price for the computer system in question at the time of the transaction at issue here was $749,160. Therefore, the December, 1979 value that a 1978 investor should have anticipated was between $525,000 and $560,000. Lyons did not project a residual value for 1985. Lyons observed that in June of 1978, there was little reason to expect that IBM would soon introduce *250 new models with price performance specifications that were radically better than historical norms, and we so find. Lyons did not state, however, whether an announcement of a new computer should have been expected in 1979, as in Raynault's Schedule 3, or in 1980, as in Raynault's "more likely scenario." Petitioner's final expert witness, George McCanless, testified regarding the fees charged by CFI to 3B. He was the only expert not stipulated as qualified by the parties. We accepted his testimony as that of an expert. McCanless testified that CFI's broker's fee was fair, in part because the Meijer lease provided 3B with such high rental payments. McCanless also testified that he was unqualified to address the reasonableness of the debt placement fee charged by CFI. Respondent's expert was S. Paul Blumenthal. Blumenthal was stipulated to be a qualified expert. In rendering his opinion, Blumenthal relied on a report prepared by his company in March of 1978 which evaluated the fair market and future residual value of the IBM System 370/148-J. The 370/148-J is basically the same as the system at issue in this case, the 370/148-K, with the exception that the former has approximately *251 half the memory size of the latter. Blumenthal also relied on a report dated December 29, 1978, which evaluated fair market and future residual values as of October 1978. This report expanded on a June 9, 1978 analysis of the used 3148-K market. The June 9 report contained only figures, whereas the December 1978 report added analysis and justification for the residual value figures in the report. According to Blumenthal the fair market value of a used system in June 1978 was 87 percent of the list price or $651,770. [22] The projected residual value of the used system in December of 1979, at the end of the 18 month lease to Meijer, was 65 percent of the June 1978 list price or $486,954. The projected June 1985 residual value of the same system was 5 percent of its cost, or $37,458. In his projections, Blumenthal anticipated residual value of the 3148 would be affected through introduction of a replacement machine for the 3148 by December of 1979. *252 After evaluating the experts' testimony, we find Lyons to be the most reliable. We find Raynault's testimony flawed in several respects. The most obvious is his potential for bias. Although he is undoubtedly qualified to render an opinion on residual value, as the promoter of the instant transaction Raynault exposes himself to possible lawsuits if his investment program collapses. Also, Raynault testified at one point that as long as technological advancement proceeded at a rate of 22 percent per annum, the year in which new technology is introduced would not affect residual value. [23] Yet much of the testimony of both petitioner's and respondent's experts focuses on when the introduction of new technology should have been expected, i.e., when new equipment would begin to force down the value of older technology. We find the issue to be important to our inquiry regarding economic profit. For these reasons, although we take into account Raynault's testimony, we discount its weight accordingly. Blumenthal did not use *253 a uniform annual decrement like Raynault, but attempted to target specific events that would impact residual value by specific amounts. Although we acknowledge the superior precision of such a method when events can be predicted with reasonable certainty, we find that, in light of IBM's secretive marketing, Blumenthal's technique is less than completely reliable. Accordingly, we give his opinion appropriate, but not dominant weight. We found Lyons to be a forthright and convincing witness. We accord his testimony the greatest weight. Perhaps his persuasiveness derives in part from the fact that his projections had the least specificity. We infer from this a candid concession that all the residual value projections involved a degree of crystal-ball gazing. Unfortunately, however, Lyons did not offer a projected residual value, or range of values, for 1985, but stopped at 1979. We therefore find his projections for that year to be accurate, and will extrapolate from them 1985 values. New computers came on the market in January, 1979, dramatically depressing the resale market. Petitioner's expert, Lyons, stated that a 1978 investor would not have anticipated introduction of *254 such a radically advanced machine so soon. He did not comment, however, on whether a 1978 investor would have anticipated 1979 or 1980 introduction of a new machine of average technological advancement, i.e., one sufficient to begin the 22 percent value decrements Raynault posited. Raynault's Schedule 3 (his worst case scenario) assumed new equipment would be introduced by December, 1979. His more likely scenario posited a December, 1980 introduction date. Respondent's expert stated that introduction of new technology should have been expected no earlier than 1980. We view as reasonable the assumption that new technology would be introduced in 1980, and proceed on the basis of that assumption. Because we found Lyons to be the most credible expert, we will apply to his 1979 residual value figure Raynault's assumptions regarding the introduction date of new technology and the average annual value decrements. Such application yields a residual value in October, 1985 of $164,059.06, or 21.9 percent of the cost of the equipment. [24]
*255 This $164,059.06 residual value is approximately 97 percent of Raynault's "more likely scenario" sale value. Because the difference is de minimis, we accept Raynault's more likely scenario as reflecting the values a reasonable investor should have anticipated. Next, we address petitioner's argument that the debt placement fee is to be computed other than in accord with Paragraph 3 of the Marketing and Remarketing Agreement. Read literally, paragraph 3 would provide a debt placement fee of 15 percent of the cost of the equipment (i.e., $749,160) or $112,374 payable out of the first proceeds after debt retirement and equity recovery. [25] In other words, the investors would get their money back but would make no profit until this entire amount was paid to CFI. Petitioner seeks to disavow the clear language of the agreement, and to show that the debt placement fee was intended to divert to CFI only 15 percent of the first proceeds received after debt retirement and equity recoupment. Initially, we note that this fee is not clearly treated in either fashion on Schedule 3. [26] Thus, we cannot look to that document for evidence of the parties' intent. Moreover, we assume the *256 fees were never paid due to a collapse in the market for used computer equipment. Thus, we cannot look to the parties' actual conduct for evidence of their intent. We are thus left with little more than Oshatz' and Raynault's testimony. Raynault's testimony was equivocal, and it is of little help here. Although Oshatz testified that the fee was intended as an 85 percent-15 percent split, he did not indicate whether the split was to begin before or after investor equity was recovered. We conclude that this testimony, so fraught with the potential for bias, cannot override the clear language of the agreement. [27] Therefore, we think that Paragraph 3 of the relevant agreement should be interpreted in accord with *257 its clear import. It contemplates a fee of 15 percent of the cost of the equipment payable out of the first proceeds available after the investors break even. With this in mind, we turn to the economics of the transaction. A 1978 investor, looking at Schedule 3 and the other documents and agreements he was to be bound by would have made the following analysis to determine whether or not he had a reasonable possibility of an economic profit: Cash Downpayment
$127,357.00
Broker's Fee: Months 1-18
60,561.00
[28] Months 19-60 33,537.50
Sale Fee
8,457.70
Debt Placement Fee
112,374.00
Debt Service Interest
211,555.95
Principal
621,803.00
Total Expenses
1,175,646.15
Rental Income
1,074,489.90
Sale Proceeds
169,154.00
Total Income
1,243,643.90
Profit (Loss)
67,997.75
*258 Therefore, having made the above calculation, the reasonable 20 percent investor would have expected to earn $13,599.55 over seven years on a $27,000 investment, or roughly 6 percent interest compounded annually. While a theoretical investor might have found a more profitable investment, we will not second guess a taxpayer's business judgment. See Estate of Thomas v. Commissioner,84 T.C. 412, 440 n. 52 (1985). We thus believe that at the time of the investment, there was economic substance to the transaction. Benefits and Burdens of Ownership
Respondent mounts a second substance over form argument which, like his economic substance argument, asks us to disregard the instant transaction and rearrange the equities to deprive 3B of rights in the equipment sufficient to enable it to pass through tax losses to its partners. He argues that the benefits and burdens of ownership did not pass to 3B. Like his economic substance argument, however, this argument must fail. Respondent relies on Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977), revg. a Memorandum Opinion of this Court, cert. denied 436 U.S. 944 (1978). He argues *259 that the rights of control over the asset and enjoyment of profits, and the risk of loss all were with CFI, not 3B. Therefore, CFI should be deemed the owner of the equipment, and 3B denied the tax benefits. In Sun Oil, the taxpayer "sold" to and simultaneously "leased" back from a tax-exempt trust parcels of real estate. In reversing this Court, the Third Circuit held that the taxpayer had retained too many of the risks, burdens and benefits of ownership of the property to be viewed as a mere lessee. Characterizing the transactions as financings, the circuit court denied the taxpayer the claimed tax benefits. In this case, the presence of some of the Sun Oil factors does not persuade us that, in the absence of so many others, we should disregard the transaction here under the principles of that case. Although the lease here was a net lease, we have repeatedly held that such a lease is common, and will not be a factor in determining the bona fides of a transaction. See, e.g., Gefen v. Commissioner,supra, at 1492-1493. There is no evidence here that CFI could repossess the property at any time, as was the case in Sun Oil. Moreover, there is *260 no evidence here that at the time the transaction was entered into, the buyer knew it would realize quarterly returns on its investment equivalent to market interest rates, without regard to the fair market rental value of the property, as was the case in Sun Oil. Finally, there is no evidence here that the buyer could be deprived of the property for nominal amounts above its predetermined investment return, as was the case in Sun Oil. To the contrary, any economic results more favorable than those Raynault predicted as likely would inure to the benefit of the 3B investors including petitioners. We are aware that Martin and Raynault, the principals of CFI, guaranteed the buyer's note obligation, and were ultimately forced to lease back the equipment at a price reflecting the guarantee payments owed and not the fair market rental value of the equipment. Under all the facts and circumstances, however, we view this arrangement as tantamount to insurance of the rent payments, not as indicative of a financing arrangement. We consider in this regard that the purpose of the transaction in Sun Oil was to enable the taxpayer to raise capital without incurring a debt obligation *261 on its books. Sun Oil Co. v. Commissioner,562 F.2d at 259. Here, nothing indicates that CFI was seeking to raise capital. Rather, it was seeking to broker computer equipment for a profit. Without an investor to buy the equipment, CFI would not have entered into the transaction. We also recognize that if the economic results were substantially less favorable than Raynault predicted as likely, CFI's fee might decrease. This would not happen until 3B's profits had shrunk to nothing, however. In any event, by this arrangement CFI merely assumed the same risk any other trade creditor assumes when providing goods or services to a start-up business, i.e., that profits will be insufficient to pay. Finally, we have considered that CFI paid for, and intended to claim as 1979 tax deductions, additional features, memory removal, and expeditious delivery of the equipment. Even if we were to admit evidence of actions occurring after 1978, the only tax year left in issue here, however, and assume as well that these actions are some evidence that the parties treated CFI, not 3B, as the owner of the equipment, we would not be persuaded that under all the facts and circumstances, *262 the parties treated CFI as the owner. There is a wealth of countervailing evidence that the parties treated 3B as the owner. This includes documentary evidence such as the Bill of Sale, Lease Assignment, and security and mortgage agreements. Cf. Grodt & McKay Realty Inc. v. Commissioner,77 T.C. 1221, 1238 (1981) (weight of the evidence, including documents, shows taxpayer treated a third party as the owner); Sun Oil Co. v. Commissioner,562 F.2d at 258 (documents, not parties' conceptions of them, govern legal characterization of the transaction). In Grodt & McKay Realty Inc. v. Commissioner,supra, at 1241, also relied upon by respondent, we stated "the agreements are clear that petitioners have no right to possess the [assets involved] or to exercise any real control or dominion over them." This is clearly a distinguishable case and without more, we think the evidence here shows petitioners had the benefits and burdens of ownership. Profit Motive
Respondent argues that petitioner's investment was not an activity engaged in for profit, and that their loss deductions are, consequently, limited by section 183. The *263 issue of whether the requisite profit objective existed is one of fact which is to be resolved by examination of the surrounding facts and circumstances. Capek v. Commissioner,86 T.C. 14, 37 (1986); Hager v. Commissioner,76 T.C. 759, 784 (1981). In making this determination, the Court will give greater weight to objective facts than mere statements of intent. Surloff v. Commissioner,81 T.C. 210, 233 (1983). The burden of proof is on petitioners to show the existence of a profit objective. Rule 142(a). In this case, the facts show a profit motive. First, 3B bought the equipment from CFI for the same price CFI paid IBM. There is no allegation, as we do not think there could be, that 3B paid more than fair market value for the equipment. Second, we have found that there was a reasonable possibility for economic profit apart from tax benefits. That profit approximated the yield of a 6-percent investment compounded annually. As such, the profit is not de minimis. Moreover, the comparison between economic profit and tax benefits is not so disproportionate as to indicate lack of profit motive. Petitioners could have expected *264 net deductions over the life of the investment of $533.26 and credits of $14,084 for total tax benefits, assuming a 50 percent marginal tax rate, of $14,350.63. [29] Thus, petitioner was looking at an investment which would yield an economic return of $13,599.55, and which would also generate $14,350.63 in tax benefits. We will not require a dollar for dollar matching of tax and economic benefits to determine profit motive. Estate of Baron v. Commissioner,83 T.C. 542, 558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). As such, these figures are close enough to pass muster. Finally, Oshatz [30] had been doing legal work for Raynault's computer leasing activities for 7 years and knew they had made substantial profits. When this transaction arose Oshatz asked about *265 the term of the lease, rental payments, the lessee's financial ability, and profit potential. He received revenue projections showing that the deal could not lose money, and was told that investors could possibly double their investment. This is further proof that the partners were engaged in the activity for profit. On the basis of the objective facts of record, petitioner has met his burden on the profit motive issue. ITC Eligibility
*266 On their 1978 tax return, petitioners claimed an ITC of $14,084 attributable to their 3B investment, which respondent disallowed. Petitioners have the burden of proving their entitlement to the credit. Rule 142(a). The ITC is disallowed to a noncorporate lessor like 3B unless, for the first 12 months of the lease, the amount of certain section 162 deductions exceeds 15 percent of the rental income produced by the property. Sec. 46(e)(3)(B). [31] The parties disagree on whether this requirement is met here, and because there is agreement regarding the rental income from the equipment for the first 12 months, the allowability of the credit turns on whether any amount may be deducted by 3B for maintenance expenses. [32]
*267 Respondent argues that since IBM did not sell machines without the maintenance service (even at a discount), since 3B paid no out-of-pocket amount for the first year's maintenance, and since petitioners' sole purpose in allocating a portion of the purchase price to maintenance was to qualify for the ITC, the deduction for maintenance expense should be denied in full, and petitioners should be denied the ITC as a nonqualifying noncorporate lessor. Alternatively, respondent contends that if the deduction is allowed, it should be limited to the rent differential in the Meijer lease. 3B's use of the rate IBM charges for monthly maintenance of a machine used 24 hours a day, seven days a week is criticized as a mere manipulation of the economics to generate tax benefits, and one which will allow the expense deduction and the ITC availability to vary from lease to lease, depending on equipment usage. The issue here is whether the disputed portion of the equipment's purchase price can be currently deducted, or must be capitalized as part of the equipment's purchase price. The parties' discussion of relevant authority is found wanting. They focus on a private letter ruling by respondent *268 and our decision in Miller v. Commissioner,85 T.C. 1064 (1985). Private letter rulings have no precedential value. Sec. 6110(j)(3); Woods Investment Co. v. Commissioner,85 T.C. 274, 281 n. 15 (1985). As we discuss further below, Miller has only marginal relevance. In Seligman v. Commissioner,84 T.C. 191 (1985), affd. 796 F.2d 116 (5th Cir. 1986), we held that administrative expense payments in connection with a computer leasing transaction had to be capitalized as part of the equipment's cost. [33] The ITC was consequently lost to the noncorporate lessors. The payments, although incurred within the first 12 months of the lease, bought services for the entire duration of the 41 month lease, and were therefore capital expenditures, not expenditures giving rise to section 162 deductions. The "expenditures" here bought services for only the initial 12 month part *269 of the lease during which payments were made, i.e., the part of the lease with which section 46(e)(3)(B) is concerned. They were not capital for that reason. For other reasons, however, we nevertheless find for respondent. For an item to be deductible during the taxable year, among other things, it must be paid or incurred during the taxable year. Sec. 162(a). Commissioner v. Lincoln Savings & Loan Assn.,403 U.S. 345, 352 (1971). From the facts recited immediately below, we think it clear that 3B did not pay or incur any expenses for maintenance. To the contrary, IBM provided free maintenance to purchasers of its equipment. The treatment of the item by all parties, including IBM, is strong evidence of this. See Waddell v. Commissioner,86 T.C. 848, 896 (1986). [34]
*270 The Agreement for Purchase of IBM Machines between IBM and CFI states that CFI agrees to purchase only "machines and features." IBM agrees to "sell" machines and "provide" warranty service. The agreement goes on to state that "IBM agrees to provide, at no additional charge to the Customer * * * warranty service." (Emphasis supplied.) In the Bill of Sale between CFI and 3B, CFI conveyed to 3B the equipment "and all rights to service in the IBM purchase agreement" but allocated no separately stated amount for the maintenance service. We note further that IBM did not sell the machines at a discount without warranty service. Miller v. Commissioner,supra, in which petitioners place great reliance, is of no help to them. Although we allowed the ITC to the taxpayers there, despite their obvious attempt to shoulder just enough of the maintenance expenses to meet the 15 percent test, there was no question that substantiated expenditures were actually made for maintenance. Those expenditures were clearly above and beyond the equipment's purchase price. See Miller v. Commissioner,supra at 1068. Section 1.46-4(d)(3)(ii), Income Tax Regs. *271 , provides that "if the lessee is obligated to pay to the lessor a charge for services which is separately stated or determinable, the expenses incurred by the lessor with respect to the services are not taken into account [in determining the amount of section 162 deductions for purposes of the 15 percent test]." Thus, although petitioners point to the rental decrease after the first 12 months as evidence that a portion of the payment is allocable to the maintenance costs, we could as easily view that differential as an amount "the lessee is obligated to pay to the lessor * * * for services * * * separately stated or determinable." We hold for respondent on this issue. [35]
Depreciation
We are asked to determine whether 3B properly applied the modified half year convention when claiming depreciation deductions under the class life asset depreciation range system. Respondent contends that 3B, a calendar year taxpayer, was not entitled to claim a full year *272 of depreciation when it was only in existence for, at most, 7 months in its first taxable year. Petitioner contends that 3B's deduction for a full calendar year's depreciation is sanctioned by respondent's regulations. We agree with respondent. Section 1.167(a)-11(c)(2)(iv)(b), Income Tax Regs., controls. It provides: If the actual number of months in a taxable year is other than 12 full calendar months, depreciation is allowed only for such actual number of months, and the term "taxable year," for purposes of this subparagraph, shall mean only such number of months. * * * See also Ocrant v. Commissioner,65 T.C. 1156 (1976); sec. 1.167-10(b), Income Tax Regs. Thus, 3B may claim only a ratable portion of the equipment's first year of depreciation deductions in its first taxable year. Respondent argues further that we should allow 3B to claim depreciation, if at all, only from June 9, 1978, when the equipment was placed in service, and not from any earlier date such as June 1, the date the partnership agreement was signed. [36] Respondent relies on section 1.167(a)-11(c)(2)(iv)(c), Income Tax Regs., for this proposition. [37]
*273 3B employed the modified half-year convention of section 1.167(a)-11(c)(2)(ii), Income Tax Regs. That subdivision and section 1.167(a)-11(c)(2)(iv)(b), Income Tax Regs., entitle 3B to claim depreciation deductions as of the first day of its taxable year, inasmuch as the equipment was placed in service during the first half of its taxable year. The regulation relied on by respondent clearly applies to property placed in service after November 14, 1979. The equipment here was placed in service prior to November 14, 1979. Respondent argues, however, that we should apply the regulation and in support, points to Ocrant v. Commissioner,supra, and section 1.6031-1(a)(1), Income Tax Regs.
We need not consider whether the regulation relied on should be applied in contravention of its expressly stated effective date. We find that even if applicable, the regulation precludes depreciation deductions for any month prior to the month in which the taxpayer begins his activity. As long as the correct month is used, however, it does not disallow depreciation deductions for any day prior to the day the taxpayer begins his activity. 3B may claim depreciation from June 1, 1978. [38] *274 Section 6621(c)
Respondent also seeks increased interest pursuant to section 6621(c). He first asserted the applicability of additional interest in his First Amendment to Answer. As such, respondent bears the burden of proof as to the additional interest. Rule 142(a). Section 6621(c) provides for an increase in the interest rate where there is a "substantial underpayment" (an underpayment of at least $1,000) in any taxable year "attributable to 1 or more tax motivated transactions." The additional interest accrues after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(B) gives the Treasury authority, by regulation, to add to the categories of transactions that, under section 6621(c), will be treated as tax motivated transactions. Under that *275 broad grant of authority, on December 26, 1984, the Treasury promulgated section 301.6621-2T, Temporary Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984), 1985-1 C.B. 368, which addresses certain questions and answers that are likely to arise under section 6621(c). Pursuant to this regulation, an underpayment attributable to a deduction disallowed under section 165(c)(2) relating to a transaction not entered into for profit is one attributable to a tax-motivated transaction. Sec. 301.6621-2T, Q & A-4, Temporary Proced. & Admin. Regs. We have previously looked to this regulation to guide decisions in this area. See, e.g., Helba v. Commissioner,87 T.C. 983 (1986); The Stanley Works and Subsidiaries v. Commissioner,87 T.C. 389 (1986). For 1978, petitioners deducted $27,624 in losses attributable to their 3B investment. They also claimed an ITC of $14,084. We have disallowed the ITC because 3B has not met the requirements of section 46(e)(3)(B). We have also disallowed 3B some depreciation-based deductions because of its improper use of the modified half year convention under section 1.167(a)-11(c)(2). Under *276 respondent's temporary regulation, the underpayment [39] of tax based on the amount of the claimed losses that are disallowed is attributable to a tax-motivated transaction if the losses relate to a transaction not entered into for profit. See section 301.6621-2T, A-4(2), Temporary Proced. & Admin. Regs. We have held, however, that the transaction at issue here was one of economic substance. We have rejected respondent's profit motive arguments. The losses do not relate to a transaction not entered into for profit. Respondent, therefore, is not entitled to increased interest. To reflect our conclusions and the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of Pub. L. 99-514, 100 Stat. 2744. We use the reference of the Internal Revenue Code of 1986. ↩
2. Petitioners concede all deductions claimed in excess of the cash they invested, i.e., $27,000. Respondent concedes petitioners claimed no 1979 deductions or credits as a result of their partnership investment. Because respondent's statutory notice of deficiency based all of petitioners' 1979 deficiency on their partnership activities, we deem this to be a total concession by respondent for the 1979 taxable year.↩
3. The lease payments by Meijer were higher than IBM's base rental rate. Meijer agreed to the higher rate because if it rented from IBM, IBM would impose a substantial surcharge for the long hours during which Meijer intended to operate the computer. A quid pro quo for Meijer appears to be the brief duration of the lease. ↩
4. The partnership of which petitioner was a member deducted $3,747 for maintenance expenses on its 1978 tax return, based on IBM's maintenance charge for continuously run computers. IBM varied this charge depending on how much time the computer was run. Meijer intended to run the equipment continuously.↩
5. Petitioner Lennard D. Greenbaum will hereinafter be referred to as petitioner.↩
6. Oshatz was counsel of record in this proceeding until the day of the trial. He first moved to withdraw when this case was called, 10 days before trial, and his partner, Edward I. Sussman, acted as counsel of record thereafter.↩
7. So stipulated. Because respondent argues on brief that 3B cannot be considered the owner of the equipment for Federal income tax purposes, we do not deem that point disposed of by the stipulation that 3B "purchased" the equipment.↩
8. The Rouse lease identifies the equipment as the "3148J." The equipment at issue here is the 3148K. ↩
9. At the commencement of the Rouse and CMI leases, a substituted note was negotiated between Term and 3B. ↩
10. The CMI lease identifies the equipment as the model "J-K." The equipment at issue here is the 3148K.↩
11. Another substituted note was then negotiated between Term and 3B.↩
*. Note:↩ This assumes that Lessee will return the equipment at the end of the lease. If it stays on rent through the end of December, income will increase by $14,202.00 and losses will decrease by $11,012.00 after $3,190.00 interest.
12. We note that real life proved to be even worse than the "worst case scenario." Percentage reductions apparently were to begin when a new generation of equipment was introduced. In January, 1979, new equipment was introduced which threw the market for used IBM equipment into disarray. Schedule 3 assumed introduction of new equipment in December, 1979.↩
13. See also Coleman v. Commissioner,T.C. Memo. 1987-195; Lansburgh v. Commissioner,T.C. Memo. 1987-164; L.W. Hardy Co. v. Commissioner,T.C. Memo. 1987-63↩.
14. Because of his involvement in structuring the arrangement, Raynault appeared as a fact witness as well as an expert.↩
15. The residual value reflected on Schedule 3 is $131,940. We are not informed of what assumptions gave rise to this figure. ↩
16. 1/3 of the annual 22 percent decrease is 7.33 percent. (June-October is 1/3 of a year.)↩
17. Raynault's chart gives a final figure of $169,154.00. We are not aware of where our methodology diverges from his, but for reasons stated below, we use his figures.↩
18. This would seem to correlate to Raynault's reductions for loss of the ITC and free maintenance. ↩
19. No annual decrement in value, such as Raynault projected in Schedule 3, appears to be factored in by Lyons for December, 1979 values.↩
20. See n. 18, above.↩
21. Although Lyons phrases his conclusion as 70-75 percent of the "current IBM list price," he appears to mean the 1978 list (petitioner's purchase) price, not the December 1979 list price, which might be different. The sentence in the report following this quoted fragment, which speaks of $749,160 as the list price, confirms this.↩
22. The report speaks of the discount for the 370/148-K central processing unit ("CPU") and does not address separately discounts for the other equipment in which petitioners invested. All parties seem to accept application of the CPU discount percentages to all the equipment.↩
23. Raynault stated it was because the IBM 4300 was so advanced that the investment here became unprofitable, not because of the time of its introduction.↩
24. Esmond Lyons concluded that a June, 1978 investor could expect a December, 1979 value of between $525,000 and $560,000. Using the median of those two figures, $542,500, as a starting point, we can extrapolate in the chart below what Lyons would have predicted as an October, 1985 sale value, using Raynault's 22 percent annual decrements. We assume here that Lyons would not begin the decrements until after December 1980 in accord with Raynault's more likely scenario assumption: ↩
Date
Residual Value
% Decrease
December, 1979
$542,500.00
December, 1980
542,500.00
December, 1981
423,150.00
22%
December, 1982
330,057.00
22%
December, 1983
257,444.46
22%
December, 1984
200,806.68
22%
October, 1985
164,059.06
18.3% (10/12 X22%)
25. We note that paragraph 2 of the agreement described another fee as a percentage of "net sale proceeds." That language was not used in paragraph 3. ↩
26. According to Schedule 3, the investor's equity begins to be recovered in 1984 and is fully recovered in 1985. In these years, however, net income is greater than the amount shown as "cash flow," i.e., equity recovery. We are not informed whether this excess income is to go to CFI, debt repayment or elsewhere.↩
27. Because this fee was not discussed by the transaction participants at the time of the investment, we are less inclined to give great weight to the post-hoc testimony of these interested witnesses.↩
28. If these months were attributable to a Meijer renewal, the broker's fee would have been higher, but the investors would have earned a profit in any event. Moreover, Meijer had no right to renew, as the lease was terminable by either party, and we think that if Meijer anticipated keeping the computer on lease after 18 months it would have negotiated an option clause and/or reduced rental payments. There is no evidence of such discussions and, as events turned out, the lease was allowed to terminate after 18 months.↩
29. This computation assumes the benefits of credits and deductions we disallow below. We factor them in because they were projected by Raynault and our inquiry focuses on what petitioner's investment motive was at the time he invested. Obviously, if we did not factor in these benefits, the comparison of economic benefits to tax benefits would be greater, strengthening petitioner's case.↩
30. The decision to invest was made largely in reliance on Goldschmidt's expertise derived from Oshatz. Although not a partner, Oshatz was the party on whom the partnership relied for purchase negotiations and management and who, therefore, should be the focus of our profit motive inquiry. See Fox v. Commissioner,80 T.C. 972, 1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,Rosenblatt v. Commissioner,Krasta v. Commissioner,Leffel v. Commissioner,Hook v. Commissioner,734 F.2d 5↩-9 (3d Cir. 1984).
31. Sec. 46(e)(3) provides, in pertinent part, as follows: (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. Petitioners do not contend 3B manufactured or produced the property at issue. Respondent did, however, raise in his reply brief for the first time the argument that 3B fails the first test of sec. 46(e)(3)(B), that the term of the lease must be less than 50 percent of the useful life of the property. Respondent contends that the leaseback to CFI in 1981 reduced to writing the true nature of the transaction from the outset, namely, a lease from 3B to CFI from the time of 3B's purchase of the equipment to its sale. This argument conflicts with respondent's theory that 3B was never the equipment's owner. Further, petitioners had no opportunity to address the issue. We therefore do not consider it. ↩
32. Since we disallow the maintenance expense deduction in full, we need not decide whether the broker's fee, the only other possible sec. 162 deduction apparent from the record, could be used for the 15-percent test under sec. 1.46-4(d)(3)(ii), Income Tax Regs. Sec. 46(e)(3)(B) requires that the relevant deductions exceed 15 percent of the applicable rent. The broker's fee equalled but did not exceed 15 percent of the rent in the first 12 months of the lease. Since we disallow the maintenance expense deduction in full, the broker's fee, even if fully qualifying for ITC purposes would therefore not help petitioners. We note also that neither party briefed or argued the effect of these fees on the availability of the ITC. See also Thielking v. Commissioner,T.C. Memo. 1987-201↩.
33. See also Nelson v. Commissioner,T.C. Memo. 1985-292, affd. 793 F.2d 179 (8th Cir. 1986). In both Seligman and Nelson,↩ unlike this case, the fees allegedly deductible under sec. 162 were separately stated.
34. Compare Houchins v. Commissioner,79 T.C. 570, 592-593 (1982), and Lemmen v. Commissioner,77 T.C. 1326, 1350-1351 (1981), cattle breeding shelter cases in which we determined, where there were separate maintenance agreements, that components of the purchase price of cattle were↩ allocable to maintenance. Significantly, in both cases, unlike here, we found that the taxpayers' stated purchase prices far exceeded the fair market value of the assets purchased. Moreover, maintenance charges were separately stated to the taxpayers.
35. We note that disallowance of the maintenance as a sec. 162 expense may also impact on the amount of allowable losses petitioners may deduct. The parties are directed to account for this in the Rule 155 computation.↩
36. Respondent does not argue that June 22, the date 3B's business certificate was filed, should be deemed the first day depreciation deductions are allowable. ↩
37. (c) For purposes of this subparagraph, for property placed in service after November 14, 1979, other than depreciable property described in paragraph (c)(2)(iv)(e) of this section, the taxable year of the person placing such property in service does not include any month before the month in which the person begins engaging in a trade or business or holding depreciable property for the production of income.↩
38. We note that 3B's depreciable basis may be impacted by our holding regarding the deductibility of maintenance expenses. The parties are directed to account for this in the Rule 155 computation.↩
39. The regulations proposed under sec. 6621 perfectly equate the term underpayment with a sec. 6211 deficiency. See sec. 301.6621-2T, A-2. Cf. sec. 6653(c) (defining underpayment for purposes of sec. 6653).↩