T.C. Memo. 2012-358

UNITED STATES TAX COURT

DONALD R. FITCH AND BRENDA T. FITCH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  157-10, 27401-10,            Filed December 26, 2012.
             27417-10.

<u>Kevan P. McLaughlin</u> and <u>Richard A. Carpenter</u>, for petitioners.

<u>Michael S. Hensley</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases, respondent determined
deficiencies in and penalties on petitioners' Federal income tax as follows:

[*2]

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|----------------------|
| 2005 | $75,258 | $15,052 |
| 2006 | 107,085 | 21,417 |
| 2007 | 124,041 | 24,808 |

After concessions,[1] the issues remaining for decision as to all years in issue

_____

[1] Respondent conceded the adjustments related to petitioners' failure to report income for all years in issue, except for their failure to report interest income for 2006. Petitioners admitted, and respondent accepted, that their actual interest income for 2006 is $47,617, an amount $4,382 greater than respondent determined in the notice of deficiency.

Petitioners conceded the following expenses they reported on Schedule C, Profit or Loss from Business, related to their accounting practice: (1) $1,161 of car and truck expenses, $1,937 of depreciation, $418 of insurance expenses, and $85 of travel expenses for 2005; (2) $1,461 of car and truck expenses, $1,156 of depreciation, and $3,987 of office expenses for 2006; and (3) $1,710 of car and truck expenses, $731 of contract labor expenses, $818 of depreciation, and $669 of insurance expenses for 2007. Petitioners conceded the following expenses they reported on Schedule C related to their real estate activity: (1) $4,202 of car and truck expenses and $1,644 of depreciation for 2005; (2) $1,978 of car and truck expenses and $641 of depreciation for 2006; and (3) $1,332 of car and truck expenses and $377 of depreciation for 2007. Respondent conceded the remaining adjustments on the Schedules C, other than the adjustments to amortization expenses on Schedules C related to the accounting practice for 2005 to 2007 and the adjustments to meal and entertainment expenses on Schedule C related to the accounting practice for 2005 to 2007 and Schedule C related to the real estate activity for 2005 and 2007.

Respondent conceded the adjustments to the rental real estate expenses petitioners reported on Schedule E, Supplemental Income and Loss, other than the adjustments for the "E Street" property for all years in issue; however, respondent contends that all of petitioners' rental real estate losses are limited by sec. 469.

Petitioners petitioned the Court for redetermination of a $3,000 long-term capital loss adjustment for 2007, but they did not raise this issue at trial or on brief;

(continued...)

**[\*3]** are: (1) whether petitioners are entitled to amortize the purchase price of an accounting practice; (2) whether petitioners are entitled to deduct rental real estate losses for the "E Street" property, and whether these and other rental real estate losses are limited by the passive activity loss rules of section 469;[2] (3) whether petitioners are entitled to deduct meal and entertainment expenses beyond the amounts allowed by respondent; (4) whether petitioners are entitled to deduct net operating loss carryovers from 2003 and 2004; and (5) whether petitioners are liable for accuracy-related penalties under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in California.

---

[1](...continued)
therefore, we find that they have abandoned it. See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987). The remaining adjustments are computational and will be resolved under Rule 155.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

**[\*4] I.** <u>Background of Petitioners</u>

Brenda T. Fitch has been a licensed real estate agent under California law since November 2001.  She works full time as an independent contractor with Remax, performing duties typical of real estate agents and brokers, including reviewing buyer criteria, soliciting listings, going on caravans,[3] and showing, leasing, and selling real property.  While she has no set schedule, she generally wakes up at 6 a.m. to review business emails, new real estate listings, and buyer criteria for her clients, and she works six days a week, taking either Saturday or Sunday off.

Donald R. Fitch has been a licensed certified public accountant (C.P.A.) in California since February 1993.  Upon receiving his license, he started an accounting practice (C.P.A. practice) as a sole proprietor in San Francisco.  He spent nearly a decade developing the C.P.A. practice, until he suffered a brain aneurysm in May 2003.  He was hospitalized for a week, underwent surgery, and slowly recuperated.

---

[3] A caravan is typically a tour of new real estate listings designed for real estate agents and brokers.

**[*5]** II.    The Sale and Repurchase of the C.P.A. Practice

On June 14, 2003, Mr. Fitch sold the C.P.A. practice (sale transaction) for $900,000 to Mark Gronke, a C.P.A. licensed in Massachusetts who worked for Mr. Fitch as an independent contractor sporadically from 1996 through 2003.  They duly executed an agreement (sale agreement) providing that the $900,000 was "due and payable in full within 1 year at the applicable federal interest rates."  The agreement stated that "Mr. Fitch has incurred recent brain surgery, Mr. Fitch understands the need to transfer the business based on health issues."  Petitioners reported the $900,000 as a capital gain on their 2003 tax return.

Mr. Fitch performed a small amount of work for the C.P.A. practice after the sale transaction to help ensure a smooth transition.  On October 31, 2003, approximately 4-1/2 months after the sale transaction, Mr. Gronke suffered a seizure and was rushed to the hospital.  Five days later, on November 5, 2003, Mr. Gronke sold the C.P.A. practice back to Mr. Fitch for $900,000 (repurchase transaction).  They duly executed another agreement (repurchase agreement) containing the same payment terms as the sale agreement.  The repurchase agreement stated that "Mark Gronke has incurred recent severe medical problems * * *.  Mr. Gronke understands the need to sell the business based on his health issues."  As a result of the repurchase transaction, petitioners claimed a $900,000

**[\*6]** cost basis in the C.P.A. practice, and they claimed an amortization deduction of $45,000 for each of the years in issue.

III.   Petitioners' Rental Real Estate

Petitioners owned eight rental real estate properties in California during the years in issue.  They chose to keep their properties separate.  Mr. Fitch owned properties on Edgewood Road, Auburn (Edgewood property); Amelia Way, Palm Springs (Amelia property); Sterling Road, Cathedral City (Sterling property); Ridgeway Ave., Cathedral City (Ridgeway property); and E Street, Sacramento (E Street property).[4]  Mrs. Fitch owned properties on Cook Street, Palm Desert (Cook Street property); Esplanade, Redondo Beach (Esplanade property); and Island Ave., San Diego (Island property).[5]

Petitioners were actively involved in the day-to-day management of their rental properties.  They performed almost all of the tasks themselves, including, inter alia, bookkeeping, making repairs, executing contracts, screening tenants, advertising, paying taxes and utilities, procuring insurance, and dealing with the

---

[4]  Mr. Fitch owned a two-thirds interest in the E Street property.  He inherited a one-third interest from his mother in early 2005, and he purchased a second one-third interest from one of his brothers in late 2005.  His other brother owned the remaining one-third interest.

[5]  Mrs. Fitch purchased the Island property in 2006.

[*7] homeowners' associations. They occasionally hired a contractor (such as an engineer or electrician) to perform a technical task. Petitioners incurred losses on the Edgewood property, Cook Street property, Esplanade property, and E Street property in 2005; the Edgewood property, Ridgeway property, Cook Street property, Esplanade property, and E Street property in 2006; and the Amelia property, Cook Street property, Esplanade property, E Street property, and Island property in 2007. Although the aggregate losses petitioners incurred in each of the years at issue exceeded $25,000, they limited the losses they claimed (in excess of their income from the rental real estate) to $25,000 each year.

IV.    Business Discussions Over Meals

Petitioners frequently discussed their respective businesses and rental real estate properties together over meals at restaurants. They occasionally dined with clients (client meals), but the vast majority of the meals were solely between themselves (spousal meals). For each meal, they recorded on general ledgers the name of the restaurant, an associated date,[6] the business purpose, the names of the people dining, and the amount spent. The general ledgers list the business purpose of almost every spousal meal as "Schedule C" and/or "Schedule E". The

---

[6] The general ledgers do not contain the individual date that each meal took place--the associated dates appear to correspond to the dates of petitioners' monthly credit card statements.

**[\*8]** discussions during the spousal meals resulted in successful client referrals between petitioners' businesses on occasion.  Petitioners claimed business expense deductions for a small number of client meals and hundreds of spousal meals.

## V.  Petitioners' Tax Returns

Mr. Fitch prepared petitioners' tax returns for 2003 to 2007, among other years.  Petitioners reported net operating losses (NOLs) for 2003 and 2004 and elected to carry the NOLs forward.  They reported zero tax for each of the years in issue.  Respondent audited petitioners' tax returns for 2005 to 2007 and disallowed, inter alia, the amortization of the C.P.A. practice, the losses on the rental real estate properties, the deductions for the client meals and spousal meals, and the NOL carryovers from 2003 and 2004.[7]  Petitioners timely petitioned the Court for redetermination.

---

[7] Respondent made several other adjustments in the notices of deficiency for 2005 to 2007.  As stated supra note 2, the other adjustments have been conceded, settled, or are computational in nature.

[*9] OPINION

I.    General Rules

The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving the determinations erroneous.[8]  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  The taxpayer bears the burden of proving that he or she is entitled to the deductions claimed, and this includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).  A taxpayer must substantiate amounts claimed as deductions by maintaining the records necessary to establish that he or she is entitled to the deductions.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business.  Sec. 162(a).  Whether an expenditure is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  Generally, for an expenditure to be an ordinary and necessary business expense, the taxpayer must show a bona fide business purpose for the expenditure; there must be a proximate

---

[8]  Petitioners have neither claimed nor established that they satisfy the requirements of sec. 7491(a) for any of the issues remaining for decision. Accordingly, the burden of proof does not shift to respondent.

[*10] relationship between the expenditure and the business of the taxpayer. Challenge Mfg. Co. v. Commissioner, 37 T.C. 650 (1962); Henry v. Commissioner, 36 T.C. 879 (1961). To be "necessary" within the meaning of section 162, an expense needs to be "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, 290 U.S. 111, 113 (1933). The requirement that an expense be "ordinary" connotes that "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." Deputy v. du Pont, 308 U.S. 488, 495 (1940) (citing Welch v. Helvering, 290 U.S. at 114).

When taxpayers establish that they have incurred deductible expenses but are unable to substantiate the exact amounts, we can estimate the deductible amount in some circumstances, but only if the taxpayers present sufficient evidence to establish a rational basis for making the estimate. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In estimating the amount allowable, we bear heavily against taxpayers whose inexactitude is of their own making. See Cohan v. Commissioner, 39 F.2d at 544. There must be sufficient evidence in the record, however, to permit us to conclude that a deductible expense was paid or incurred. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Furthermore, we may not use the Cohan doctrine to estimate expenses subject to the strict

[*11] substantiation requirements of section 274(d).  See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969).

II.     Amortization of the C.P.A. Practice

A taxpayer is entitled to an amortization deduction with respect to any amortizable section 197 intangible, the amount of which is determined by amortizing the adjusted basis of the intangible ratably over a 15-year period beginning with the month in which it was acquired.  Sec. 197(a).  An amortizable section 197 intangible is any section 197 intangible[9] acquired by a taxpayer after August 10, 1993, and held in connection with the conduct of a trade or business.  Sec. 197(c)(1).  For purposes of depreciation and amortization, a taxpayer's basis in purchased property is the cost, including any valid liabilities incurred in acquiring the property.  Crane v. Commissioner, 331 U.S. 1 (1947).  Petitioners claimed a $900,000 cost basis in the C.P.A. practice as a result of the repurchase transaction, and they claimed an amortization deduction of $45,000 in each of the years in issue on their tax return.[10]  Respondent principally argues that "the alleged

---

[9]  Sec. 197 intangibles include, inter alia, goodwill, going-concern value, business books and records, trade names, and covenants not to compete entered into in connection with the acquisition of an interest in a trade or business.  Sec. 197(d).

[10]  It appears that petitioners miscalculated their amortization deductions.

(continued...)

**[*12]** sales agreements petitioners submitted are untrustworthy and the alleged sales did not take place". Alternatively, respondent argues the sale and repurchase transactions were rescinded or that petitioners reacquired self-created intangibles of the C.P.A. practice in a series of related transactions.[11] We address each of respondent's arguments in turn.

Respondent contends that petitioners presented false testimony and fabricated documents in an attempt to prove that the transactions took place. We disagree. We find petitioners' testimony to be credible and persuasive. See Diaz v. Commissioner, 58 T.C. 560, 564 (1972) (stating that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life). Furthermore, we find the sale and repurchase agreements to be genuine and trustworthy.

---

[10](...continued)
Under sec. 197, petitioners' $900,000 basis is ratably amortized over a 15-year period, which comes out to $60,000 per year. Respondent has not argued that the C.P.A. practice consisted of any class of assets other than intangibles to which part of the $900,000 purchase price should be allocated. See sec. 1060(a).

[11] Respondent also questions Mr. Fitch's wisdom in repurchasing the C.P.A. practice. However, it is beyond this Court's purview to second-guess Mr. Fitch's business judgment or the manner of operations of his business. See, e.g., Rozzano v. Commissioner, T.C. Memo. 2007-177; Greenbaum v. Commissioner, T.C. Memo. 1987-222.

**[*13]** Respondent attacks the agreements for their brevity, arguing that they lack "details that would certainly be present on an authentic sales contract of nearly one million dollars."[12]  However, the circumstances surrounding the sale and repurchase transactions present a different story.  Mr. Fitch was recovering from an aneurysm at the time he sold the C.P.A. practice to Mr. Gronke.  They had a working relationship dating back to 1996, and they understood the need to effect a quick sale on account of Mr. Fitch's medical condition.  They put the basic elements of their agreement into writing and left the details to be sorted out later.  Likewise, when Mr. Gronke suffered a seizure, they signed a similar agreement to effect a quick repurchase.  In these circumstances, we find it hard to believe that a lack of details somehow suggests the agreements were fabricated.  Respondent does not argue that the sale and repurchase agreements are invalid or unenforceable under State law.  Accordingly, we find that petitioners have proven that the sale and repurchase transactions actually took place.

Next, respondent argues that the sale and repurchase transactions were rescinded.  Rev. Rul. 80-58, 1980-1 C.B. 181, defines rescission as "the abrogation, canceling, or voiding of a contract that has the effect of releasing the

_____

[12]  Respondent takes issue with, among other things, the length of the agreements and the lack of provisions addressing breach or default.

[*14] contracting parties from further obligations to each other and restoring the parties to the relative positions that they would have occupied had no contract been made." "For the rescission to be effective, both buyer and seller must be put back in their original positions." Hutcheson v. Commissioner, T.C. Memo. 1996-127 (citing Rev. Rul. 80-58, 1980-1 C.B. at 181). "A rescission may be effected by mutual agreement of the parties, by one of the parties declaring a rescission of the contract without the consent of the other if sufficient grounds exist, or by applying to the court for a decree of rescission." Rev. Rul. 80-58, 1980-1 C.B. at 181-182.

The repurchase agreement, by its own terms, effected a sale of the C.P.A. practice from Mr. Gronke to Mr. Fitch and not an unwinding of the earlier sale. There is no evidence that Mr. Fitch and Mr. Gronke intended to abrogate, cancel, or void the sale agreement. Furthermore, we do not believe that the repurchase agreement returned them to their original positions. The C.P.A. practice continued as a dynamic, ongoing enterprise for approximately 4-1/2 months after the sale transaction, and we cannot say that Mr. Fitch received the C.P.A. practice back in the exact same condition in which he had sold it. Accordingly, we find that the sale and repurchase transactions were not rescinded.

**[\*15]**  Respondent cursorily cites section 1.197-2(d)(2)(iii)(C), Income Tax Regs., in support of the position that "no amortization is available under I.R.C. § 197 for self-created intangibles that are repurchased as part of a series of related transactions".  Self-created intangibles generally are not amortizable.  Sec. 197(c)(2).  However, an exception is provided if a taxpayer disposes of a self-created intangible and subsequently reacquires the intangible from a seller (in whose hands the intangible is amortizable) in an unrelated transaction.  Sec. 1.197-2(d)(2)(iii)(C), Income Tax Regs.

Almost all of the intangibles that Mr. Fitch reacquired in the repurchase transaction were originally created by him.  The issue therefore turns on whether the sale and repurchase transactions were related transactions.  We find that the transactions were impelled by separate business exigencies, namely Mr. Fitch's anuerysm and Mr. Gronke's seizure.  It is hard to believe these medical conditions could have been predicted or the transactions necessitated by them preplanned.  We find that the sale and repurchase transactions are not related transactions, and therefore the rules generally disallowing the amortization of self-created intangibles do not apply.[13]

---

[13]  Likewise, the antichurning rules of sec. 197(f)(9) do not apply.  <u>See</u> sec. 1.197-2(h)(5)(ii), Income Tax Regs.

**[\*16]** Accordingly, petitioners are entitled to an amortization deduction of $60,000 for each of the years in issue.

III.    Deductibility of the Rental Real Estate Losses

    A.    The E Street Property

Section 212 allows as a deduction all the ordinary and necessary expenses paid during the year for the production or collection of income, sec. 212(1), or for the management, conservation, or maintenance of property "held for the production of income", sec. 212(2).  Section 167(a)(2) allows as a deduction a reasonable allowance for depreciation of property "held for the production of income."  The phrase "held for the production of income" has the same meaning in section 212 and section 167.  Mitchell v. Commissioner, 47 T.C. 120, 129 (1966).  Expenses and depreciation may be deducted only if the property is held for production of income during the taxable year at issue.  Meredith v. Commissioner, 65 T.C. 34, 41 (1975).  Section 1.212-1(b), Income Tax Regs., provides: "ordinary and necessary expenses paid or incurred in the management, conservation, or maintenance of a building devoted to rental purposes are deductible notwithstanding that there is actually no income therefrom in the taxable year, and regardless of the manner in which or the purpose for which the property in question was acquired."  Furthermore, expenses paid or incurred in

[*17] connection with investment property may be deductible under this regulation, "even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will otherwise be productive of income and even though the property is held merely to minimize a loss with respect thereto." Sec. 1.212-1(b), Income Tax Regs.  Whether property is held for the production of income is a question of fact to be determined from all the facts and circumstances. Johnson v. Commissioner, 59 T.C. 791 (1973), aff'd, 495 F.2d 1079 (6th Cir. 1974).

Mr. Fitch and his two brothers each inherited a one-third interest in the E Street property in early 2005 when their mother passed away.  They immediately tried to sell the property but did not receive a satisfactory offer.  Toward the end of 2005 Mr. Fitch purchased an additional one-third interest from one of his brothers and as of the time of trial owned a two-thirds tenancy in common with his other brother.

While Mr. Fitch did not succeed in renting the E Street property in 2005 to 2007, we find that he held the property for the production of income.[14]  He credibly testified that he intended to make the property into a rental when he

---

[14] The record reflects that Mr. Fitch succeeded in renting the property in 2009.

**[\*18]** purchased the one-third interest from his brother. To that effect, he posted a "for rent" sign on the property, placed an advertisement on Craigslist, and secured bids with insurance companies for a landlord protection policy. He further credibly testified that he performed property management services at least weekly in 2005 and continued performing those services in 2006 and 2007. Accordingly, he incurred expenses for the management, conservation, or maintenance of property held for the production of income, and he is entitled to deduct those expenses under section 212.

B.     Passive Activity Loss Limitation Rules

Deductions for certain business and investment expenses pursuant to sections 162 and 212 may be limited under section 469, which generally disallows any passive activity loss for the tax year. A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). A passive activity loss is defined as the excess of the aggregate losses from all passive activities for the year over the aggregate income from all passive activities for such year. Sec. 469(d)(1). A rental activity is generally treated as a per se

**[*19]** passive activity regardless of whether the taxpayer materially participates.[15]

Sec. 469(c)(2).

Pursuant to section 469(c)(7), the rental activities of a taxpayer who is in the real property business (real estate professional) are not per se passive activities but are treated as a trade or business subject to the material participation requirements of section 469(c)(1). Sec. 1.469-9(e)(1), Income Tax Regs. A taxpayer qualifies as a real estate professional and is not engaged in a passive activity under section 469(c)(2) if:

> (i) more than one-half of the personal services performed in trades or businesses by the taxpayer during such taxable year are performed in real property trades or businesses in which the taxpayer materially participates, and

> (ii) such taxpayer performs more than 750 hours of services during the taxable year in real property trades or businesses in which the taxpayer materially participates.

Sec. 469(c)(7)(B). A real property trade or business is defined in section 469(c)(7)(C) as "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." In the case of a joint return, the foregoing

---

[15] A rental activity is "any activity where payments are principally for the use of tangible property." Sec. 469(j)(8).

**[*20]** requirements for qualification as a real estate professional are satisfied if, and only if, either spouse separately satisfies the requirements. Sec. 469(c)(7)(B). All of a taxpayer's real estate activities are taken into account to determine whether the 750-hour requirement is satisfied. See Fowler v. Commissioner, T.C. Memo. 2002-223; Bailey v. Commissioner, T.C. Memo. 2001-296.

Section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides:

> The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

We have held that the regulations do not allow a postevent "ballpark guesstimate". Bailey v. Commissioner, T.C. Memo. 2001-296; Goshorn v. Commissioner, T.C. Memo. 1993-578.

Mrs. Fitch works full time as a licensed real estate agent. She credibly testified that she works weekdays and many weekends, and typically wakes up at 6 a.m. to review business emails, new real estate listings, and buyer criteria for her clients. She credibly testified that in addition to the time she spent managing her

**[\*21]** rental real estate, she spent more than 750 hours each year in 2005 to 2007 performing real estate related activities as an independent contractor with Remax, which we find qualifies as a real property trade or business under section 469(c)(7)(C). She further credibly testified that she was not involved in any activities besides real estate. We find Mrs. Fitch has established that she separately satisfies the requirements to qualify as a real estate professional under section 469(c)(7), and therefore petitioners' rental activities are subject to the material participation requirements of section 469(c)(1).

Material participation is defined as involvement in the operations of the activity that is regular, continuous, and substantial. Sec. 469(h)(1). As explained in section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5696 (Feb. 25, 1988), a taxpayer can satisfy the material participation requirement if the individual meets any one of the seven regulatory tests:

> (1) The individual participates in the activity for more than 500 hours during such year;
>
> (2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;
>
> (3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in

[*22] the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity * * * for the taxable year, and the individual's aggregate participation in all significant participation activities during the year exceeds 500 hours;

(5) The individual materially participated in the activity * * * for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity * * *, and the individual materially participated in the activity for any three tax years (whether or not consecutive) preceding the taxable year; or

(7) Based on all of the facts and circumstances * * *, the individual participates in the activity on a regular, continuous, and substantial basis during such year.

"Participation" generally means all work done in an activity by an individual who owns an interest in the activity. Sec. 1.469-5(f), Income Tax Regs. Work done by an individual in the individual's capacity as an investor in an activity is not treated as participation in the activity unless the individual is directly involved in the day-to-day management or operations of the activity. Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

In determining whether a taxpayer materially participates, the participation of the spouse of the taxpayer shall be taken into account. Sec. 469(h)(5). We therefore treat petitioners as one unit for the purpose of determining their

[*23] participation in an activity. However, petitioners did not make the election to treat all of their interests in real property as one activity pursuant to section 469(c)(7)(A) and section 1.469-9(g)(1), Income Tax Regs., and must therefore satisfy the material participation requirements with respect to each of their rental properties separately. See Shaw v. Commissioner, T.C. Memo. 2002-35.

We find that petitioners satisfy the second enumerated test for material participation: their participation in the rental real estate constituted substantially all of the participation. Mr. Fitch testified extensively as to the activities he performed with respect to his rental properties,[16] including, inter alia, advertising, bookkeeping, accounting, dealing with contractors, decorating, resolving fence disputes, making repairs, paying taxes, and procuring insurance. He further testified that no one else performed any services for his properties. Mrs. Fitch similarly testified as to the activities she performed in managing her rental properties, including, inter alia, advertising, decorating, dealing with contractors and the homeowners' associations, screening tenants, filling out paperwork, making repairs, and handling the lockbox and keys. She further testified that no one other than she and Mr. Fitch performed any services for her properties.

---

[16] Mr. Fitch did not testify about the activities he performed in regard to the Sterling property. However, the Sterling property did not generate a loss for any of the years in issue.

**[\*24]** Respondent argues that we should disregard petitioners' testimony as self-serving; however, we find their testimony credible and persuasive. We do not believe that petitioners' decision to occasionally hire a contractor to perform technical tasks disqualifies their substantial day-to-day management of their rental properties from constituting "substantially all of the participation".[17] See sec. 1.469-5T(a)(2), Temporary Income Tax Regs, supra. Accordingly, petitioners' losses attributable to their rental real estate in 2005 to 2007 are not limited by the passive activity loss limitation rules of section 469.[18]

IV.    Meal and Entertainment Expenses

Meal and entertainment expenses may be deducted under section 162 if they are ordinary, necessary, and reasonable expenses incurred by a taxpayer in his or

---

[17] Mr. Fitch testified that in 2005 and 2006, Mrs. Fitch would ask the wife of a client to show the Esplanade property to prospective tenants. However, Mr. Fitch was "not sure exactly when and where or how often." Given the extensive activities petitioners performed with respect to the Esplanade property, we likewise do not believe this would preclude a finding that petitioners performed substantially all of the activities.

[18] We reach this conclusion notwithstanding that petitioners reported rental real estate losses of only $25,000 in excess of their rental income on Schedules E of their tax returns for 2005 to 2007 and now argue that their losses should not be limited by sec. 469. We have long held that "A taxpayer is not bound on an issue by a position taken on their tax returns, although that is a factor to be considered." Casey v. Commissioner, 38 T.C. 357, 384 (1962).

[*25] her trade or business.[19]  See Tyson v. Commissioner, T.C. Memo. 2009-176.

However, section 262 disallows any deduction with respect to personal, living, or

family expenses.  Petitioners claimed deductions for a small number of client meals

and hundreds of spousal meals as business expenses on Schedules C related to their

accounting practice and real estate activity for 2005 to 2007.[20]  Respondent

contends that the spousal meals are nondeductible personal expenses and not

ordinary and necessary business expenses.[21]

---

[19]  This category of expenses is also subject to the limitations of sec. 274(a) and (n) and the strict substantiation requirements of sec. 274(d).

[20]  Petitioners claimed deductions for meal and entertainment expenses on Schedules C related to their accounting practice of $6,414 for 2005, $5,695 for 2006, and $7,972 for 2007 and Schedules C related to their real estate activity of $859 for 2005, $42 for 2006, and $1,214 for 2007.  Respondent disallowed all of the deductions in the notices of deficiency, except for the $42 for 2006.  Respondent subsequently stipulated that petitioners are entitled to a deduction of $1,000 each year (in addition to the $42 allowed for 2006) because "respondent assumes petitioners likely had some deductible meal and entertainment expenses during the years at issue".  Neither party provided the Court with an explanation of how respondent arrived at this figure.  We attribute the $1,000 to the deductions petitioners would be entitled to for the client meals.  We attribute the deductions respondent disallowed in excess of $1,000 to petitioners' expenditures for their spousal meals.  The Court will not sift through the voluminous documents petitioners provided to attempt to match the evidence to respondent's adjustments. See, e.g., Hale v. Commissioner, T.C. Memo. 2010-229.

[21]  Respondent contends for the first time in his reply brief that petitioners' general ledgers "simply do not meet the strict substantiation requirements set forth in section 274(d)."  Our resolution of the first issue makes it unnecessary for us to

(continued...)

[*26] Petitioners testified that on occasion their discussions during the spousal meals led to client referrals between their businesses; however, petitioners' testimony was general, vague, and conclusory. They did not recount the specific business purpose of any spousal meal nor the specific business discussions that took place. Quite to the contrary, Mrs. Fitch testified: "[M]ostly I vented with him [Mr. Fitch] regarding my real estate clients". Likewise, the general ledgers petitioners introduced into evidence contain vague and inadequate descriptions of the purported business purposes of the spousal meals.[22] Petitioners have not met their burden of proving that the spousal meals are ordinary and necessary business expenses. See Moss v. Commissioner, 80 T.C. 1073, 1078 (1983) ("Daily meals are an inherently personal expense, and a taxpayer bears a heavy burden in proving they are routinely deductible."), aff'd, 758 F.2d 211 (7th Cir. 1985). Accordingly, petitioners are not entitled to a deduction for meal and entertainment expenses in excess of the $1,000 respondent allowed for each year.

---

[21](...continued)
consider this issue.

[22] The general ledgers list the business purpose of almost every spousal meal as "Schedule C" and/or "Schedule E".

**[\*27]** V.     NOL Carryover

An NOL is defined in section 172(c) to mean the excess of allowable deductions over gross income.  Section 172(a) allows an NOL deduction for the aggregate of the NOL carrybacks and carryovers to the taxable year.  Section 172(b)(1)(A) generally provides that the period for an NOL carryback is 2 years and that the period for an NOL carryover is 20 years.  A taxpayer claiming an NOL deduction for a taxable year must file with the tax return for that year a concise statement setting forth the amount of the NOL deduction claimed and all material and pertinent facts, including a detailed schedule showing the computation of the NOL deduction.  Sec. 1.172-1(c), Income Tax Regs.  The taxpayer bears the burden of establishing both the actual existence of NOLs in the prior years and the amount of such losses that may be carried to the years at issue.  Keith v. Commissioner, 115 T.C. 605, 621 (2000).  We have jurisdiction to consider such facts related to years not in issue as may be necessary for redetermination of tax liability for the period before the Court.  See sec. 6214(b).

Petitioners claimed deductions for NOLs of $57,139 and $44,260 on their 2003 and 2004 tax returns, respectively.  Thereafter petitioners attempted to carry the NOLs forward and claim them as deductions for the years in issue.  Respondent disallowed the NOL carryovers for lack of substantiation.  The only

[*28] evidence petitioners provided to the Court to substantiate the NOL carryovers is their 2003 and 2004 tax returns and the NOL worksheets contained therein. However, a tax return is merely a statement of a taxpayer's claim and does not establish the correctness of the facts stated therein. See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837-839 (1974). We find that petitioners have not substantiated the NOL carryovers. Accordingly, they are not entitled to deduct the NOL carryovers from 2003 or 2004.

## VI.    Accuracy-Related Penalties

Section 7491(c) provides that the Commissioner bears the burden of production with respect to the liability of any individual for additions to tax and penalties. "The Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty, addition to tax, or additional amount". Swain v. Commissioner, 118 T.C. 358, 363 (2002); see Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The Commissioner, however, does not have the obligation to introduce evidence regarding reasonable cause or substantial authority. Higbee v. Commissioner, 116 T.C. at 446-447. Once the Commissioner has met his burden of production, the taxpayer must come

**[*29]** forward with evidence sufficient to persuade a court that the Commissioner's determination is incorrect. Id.

Respondent determined that petitioners are liable for section 6662(a) accuracy-related penalties for 2005 to 2007.[23] Pursuant to section 6662(a) and (b)(1), a taxpayer may be liable for a penalty of 20% on the portion of an underpayment of tax due to negligence or disregard of rules or regulations. The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code and any failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence is "strongly indicated" where the taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. "Disregard" means any careless, reckless, or intentional disregard.

---

[23] Respondent determined that petitioners have underpayments for 2005 to 2007 attributable to (1) negligence or disregard of rules and regulations and (2) substantial understatements of income tax.

**[\*30]** Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.  We find that respondent has met his burden of production.[24]

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of a tax underpayment that is attributable to any substantial understatement of income tax, defined in section 6662(d)(1)(A) as an understatement that exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  The exact amounts of petitioners' underpayments, if any, will depend upon the Rule 155 computations, taking into account respondent's concessions and in accordance with our findings and conclusions.  To the extent that those computations establish  that petitioners have substantial understatements of income tax, respondent will have also met his burden of production in this regard.  See Jarman v. Commissioner, T.C. Memo. 2010-285.

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he acted with reasonable cause and in good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448.  The determination of whether a taxpayer acted with reasonable cause and in

---

[24]  Petitioners failed to substantiate the NOL carryovers and the Schedule C expenses they conceded as set forth supra note 2.  Furthermore, petitioners did not present any evidence of any attempt they made to ascertain the correctness of the deductions they claimed for the spousal meals--deductions that would seem to a reasonable and prudent person to be "too good to be true".

[*31] good faith depends on the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners argue that Mr. Fitch, who prepared their tax returns for the years in issue, suffered an aneurysm in 2003 and the aneurysm was a serious illness outside his control that supports a reasonable cause defense to the accuracy-related penalties. While we sympathize with Mr. Fitch's circumstances, we do not find petitioners' argument persuasive because Mr. Fitch continued to work as a C.P.A. in the C.P.A. practice during the years in issue. See, e.g., Stewart v. Commissioner, T.C. Memo. 2010-184, 2010 Tax Ct. Memo LEXIS 220, at *29 (finding that the taxpayer's illness did not support a reasonable cause or good faith defense because her testimony about the illness was uncorroborated, and she continued to work for the IRS and to participate in her investment activity during the years in issue).

Accordingly, we find that petitioners are liable for an accuracy-related penalty on the amounts of their underpayments of tax, if any, for the years in issue. That determination must await the Rule 155 computations.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*32]** To reflect the foregoing and the parties' concessions,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.